**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 13-CR-2016-LRR |
| vs. | | |
| RANDY PATRIE, | | **SENTENCING MEMORANDUM** |
| Defendant. | | |

———————————

*TABLE OF CONTENTS*

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

II.  RELEVANT PRIOR PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . **4**

III.  SENTENCING FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . **5**

IV.  EVIDENTIARY RULES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

V.  FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    A.  *Background and Investigation.* . . . . . . . . . . . . . . . . . . . . **7**
    B.  *The Murder of Carl Kenneth Gallmeyer.* . . . . . . . . . . . . . . **12**

VI.  ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

VII.  BASE OFFENSE LEVEL AND SPECIFIC
    OFFENSE CHARACTERISTICS. . . . . . . . . . . . . . . . . . . . . . **16**

    A.  *Cross Reference.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
        1.  *Analogous offense.* . . . . . . . . . . . . . . . . . . . . . **18**
        2.  *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . **20**
        3.  *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

VIII.  CHAPTER THREE ADJUSTMENTS. . . . . . . . . . . . . . . . . . . **23**

    A.  *Aggravating Role.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
    B.  *Obstruction of Justice.* . . . . . . . . . . . . . . . . . . . . . . . . **24**
        1.  *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . **24**
        2.  *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . **24**
        3.  *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
    C.  *Acceptance of Responsibility.* . . . . . . . . . . . . . . . . . . . **27**

        1.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2.    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        3.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**IX.**    **CHAPTER FOUR ADJUSTMENTS.** . . . . . . . . . . . . . . . . . . . . . 29

    **A.**    **Career Offender.** . . . . . . . . . . . . . . . . . . . . . . . . . 29
        1.    *Crime of violence.* . . . . . . . . . . . . . . . . . . . . . . . 29
            a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . 29
            b.    *Applicable law and application.* . . . . . . . . . . . 30
        2.    *Predicate offenses.* . . . . . . . . . . . . . . . . . . . . . . 30
            a.    *State drug offense.* . . . . . . . . . . . . . . . . . 30
                i.    *Parties' arguments.* . . . . . . . . . . . . . 30
                ii.    *Applicable law.* . . . . . . . . . . . . . . . 31
                iii.    *Application.* . . . . . . . . . . . . . . . . . 32
            b.    *Burglary.* . . . . . . . . . . . . . . . . . . . . . . 33
        3.    *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    **B.**    **Armed Career Criminal.** . . . . . . . . . . . . . . . . . . . . 34
        1.    *Unconstitutional judicial fact-finding.* . . . . . . . . . . . . 35
            a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . 35
            b.    *Applicable law.* . . . . . . . . . . . . . . . . . . . 35
            c.    *Application.* . . . . . . . . . . . . . . . . . . . . . 36
        2.    *Second degree burglary as a predicate offense.* . . . . . . . . 36
            a.    *Parties' arguments.* . . . . . . . . . . . . . . . . . 36
            b.    *Applicable law.* . . . . . . . . . . . . . . . . . . . 37
            c.    *Application.* . . . . . . . . . . . . . . . . . . . . . 40
                i.    *Categorical approach.* . . . . . . . . . . . . 41
                ii.    *Modified categorical approach.* . . . . . . . . 43
            d.    *Continuous conduct.* . . . . . . . . . . . . . . . . . 45
                i.    *Parties' arguments.* . . . . . . . . . . . . . 45
                ii.    *Applicable law.* . . . . . . . . . . . . . . . 46
                iii.    *Application.* . . . . . . . . . . . . . . . . . 46
        3.    *Second degree attempted burglary.* . . . . . . . . . . . . . . 48
            a.    *Vagueness.* . . . . . . . . . . . . . . . . . . . . . . 48
                i.    *Parties' arguments.* . . . . . . . . . . . . . 48
                ii.    *Applicable law and application.* . . . . . . . . 48
            b.    *Second degree attempted burglary as a predicate offense.* 49
        4.    *Third degree burglary as a predicate offense.* . . . . . . . . . 53
        5.    *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**X.**    **PRE-DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE.** . 56

**XI.**    **DEPARTURES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      *A.*     *Departure Under USSG §4A1.3(a).* . . . . . . . . . . . . . . . . . . *57*
             *1.*     *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . *57*
             *2.*     *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . *58*
             *3.*     *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . *58*
      *B.*     *Departures Under USSG §5K2.0 and USSG §5K2.1.* . . . . . . . . . . . *61*
   *XII.*     *DISPOSITION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *62*

# I.  INTRODUCTION

The matter before the court is the sentencing of Defendant Randy Patrie after his pleas of guilty to two federal crimes: possession of firearms as a felon and possession of sawed-off shotguns.

# II.  RELEVANT PRIOR PROCEEDINGS

On July 23, 2013, a grand jury returned a four-count Indictment (docket no. 2) against Defendant.  Count 1 charged Defendant with theft of firearms from a federally licensed firearms dealer, in violation of 18 U.S.C. § 922(u).  Count 2 charged Defendant with possession of stolen firearms, in violation of 18 U.S.C. § 922(j).  Count 3 charged Defendant with being a felon in possession of firearms as an armed career criminal, in violation of 18 U.S.C. § 922(g)(1).  Count 4 charged Defendant with being in possession of sawed-off shotguns, in violation of 26 U.S.C. § 5861(d).

On September 6, 2013, Defendant pled guilty to the offenses charged in Count 3 and Count 4 of the Indictment before Chief Magistrate Judge Jon Scoles (docket no. 23). This court accepted the pleas of guilty on September 24, 2013 (docket no. 27) upon the Report and Recommendation of the magistrate judge (docket no. 24).

On November 26, 2013, the United States Probation Office filed a Final Presentence Investigation Report ("Final PSIR") (docket no. 32).  On January 3, 2014, the government and Defendant filed sentencing memoranda ("Government's Sentencing Memorandum") (docket no. 40); ("Defendant's Sentencing Memorandum") (docket no. 41-1) with respect to the contested issues in the Final PSIR.  Thereafter, on January 16, 2014, the United States Probation Office filed a Second Revised Final Presentence Investigation Report ("PSIR") (docket no. 42).

On February 6, 2014, the court held a sentencing hearing at which it received evidence on the sentencing issues (docket no. 47).  The court heard testimony from several witnesses and received a number of exhibits.  The court granted time to file post-hearing

briefs. On February 13, 2014, the government filed a "Post-Hearing Sentencing Brief" ("Government's Post-Hearing Brief") (docket no. 51), and the government filed an Addendum to the Government's Post-Hearing Brief (docket no. 52) the following day. On February 19, 2014, Defendant filed a "Post Hearing Sentencing Brief" ("Defendant's Post-Hearing Brief") (docket no. 53). On February 21, 2014, the government filed a Reply (docket no. 54).

The court now turns to consider the issues raised by the parties. The sentencing hearing will resume on **June 19, 2014 at 2:00 p.m.**, at which time the court will hear victim impact statements, arguments on the issue of what sentence the court should impose and permit Defendant to address the court if he wishes to do so.

### III. SENTENCING FRAMEWORK

A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). A defendant's advisory Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812 (citing *Gall*, 552 U.S. at 49-50). "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall*, 552 U.S. at 50); *see, e.g.*, *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("[It] will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008))). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Braggs*, 511 F.3d at 812 (quoting *Gall*, 552 U.S. at 50). "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.* (quoting *Gall*, 552 U.S. at 50).

## IV. *EVIDENTIARY RULES*

At sentencing, the court makes findings of fact by a preponderance of the evidence. *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [G]uidelines are applied in an advisory manner."). The court considers a wide variety of evidence, including the undisputed portions of the PSIR, as well as the testimony and other evidence the parties introduced at the sentencing hearing. The court does not "put on blinders" by only considering the evidence directly underlying Defendant's offenses of conviction. In calculating Defendant's advisory Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG §1B1.3. The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008). When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it [was] probably accurate," the court credits

hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005). The sentencing judge is afforded great discretion in determining the credibility of witnesses and making findings of fact. *United States v. Bridges*, 569 F.3d 374, 377-78 (8th Cir. 2009).

## V.  FACTS

### A.  Background and Investigation

The facts admitted to by Defendant in the PSIR[1] coupled with the testimony and exhibits received during the evidentiary hearing establish the following offense conduct and relevant conduct by a preponderance of the evidence:

Defendant, a multi-convicted burglar, in spite of his status as a felon, has a fondness for firearms and acquiring them through illegal means. He acquired three firearms using a straw purchaser, his girlfriend who later became his wife, and stole a number of them during residential and commercial burglaries.

On June 6, 2010, Defendant's then-girlfriend, Wendi Alderman, purchased a Century Arms 762x54R caliber rifle, serial number 9130196573, from Mills Fleet Farm in Mason City, Iowa. On February 12, 2011, Defendant's then-wife, Wendi Patrie (née Alderman), purchased two more long guns, specifically a Mossberg International rifle, serial number HJH3126371 and a Romarm 7.62x39 caliber rifle, serial number AF12821989, from Mills Fleet Farm in Mason City. At the time of both purchases, Wendi Patrie claimed on ATF Form 4473 that she was the actual buyer of the firearms, but, later, Wendi Patrie testified that Defendant was with her when she bought the firearms, told her which firearms to buy, paid for the firearms and possessed the firearms.

On July 4, 2013, a search warrant was executed at the Charles City, Iowa home of Defendant and Wendi Patrie. The warrant was issued following a burglary at 8:00 p.m.

---

[1] "Under our cases, a district court is clearly permitted to accept as true all factual allegations contained in the PSR that are not specifically objected to by the parties." *United States v. Beatty*, 9 F.3d 686, 690 (8th Cir. 1993).

that same date at the Charles City, Iowa home of Donna Patrie, Defendant's stepmother, during which Defendant was observed removing boxes and totes from the residence and taking them to his own home. The boxes and totes contained collectible coins. Even though it was a very hot day, observers reported that Defendant wore gloves during the burglary of his stepmother's home. Defendant's home is about one block from the home of his stepmother.

After discovering that one of the guns seized from Defendant's residence during the July 4, 2013 search matched one of the guns stolen from a September 25, 2012 burglary of the home of Carl Kenneth Gallmeyer, law enforcement obtained and executed another search warrant at Defendant's residence on July 9, 2013.

During the searches, investigators found not only the property taken from Donna Patrie and the gloves Defendant wore during the burglary, but also the following items:

> 1. Firearms, a flat-screen television, tools, a dummy surveillance camera, a chainsaw and a night vision scope belonging to Mr. Gallmeyer. On October 4, 2012, law enforcement officers responded to a call for a welfare check at Mr. Gallmeyer's rural Nashua, Iowa home. Mr. Gallmeyer's house had been burglarized, ransacked and was in complete disarray. The burglar stole, among other items, a flat-screen television, a number of tools and three firearms. Officers also found Mr. Gallmeyer's body lying on a bed with a single head wound from a .410 gauge shotgun shell. Investigators later determined that Mr. Gallmeyer had died on or about September 25, 2012. The serial numbers on the firearms and the flat-screen television found at Defendant's home matched the serial numbers of identical items stolen during the burglary of Mr. Gallmeyer's home. The physical properties of the tools seized from Defendant's home were consistent with tools stolen during the burglary of Mr. Gallmeyer's home. Photographs of the tools had been retained by Mr. Gallmeyer prior to his death.

2. Two firearms belonging to Gerald Slessor of Nashua, Iowa, which were stolen during a burglary on March 31, 2013. The firearms were identified by Slessor based on the unique markings on them. Slessor's home was also burglarized on September 16, 2012.

3. Twenty-two firearms (seventeen hand guns, four long guns and one black powder weapon) that had been stolen from Gilbert's Sale Yard, a federally licensed firearms dealer, in Floyd, Iowa, during a May 2, 2013 burglary. The serial numbers on the seized firearms matched the serial numbers of the stolen firearms.

4. Three firearms purchased by Wendi Patrie at Mills Fleet Farm. They were found in the attic of the Patries' home commingled with the other firearms.

5. Two sawed-off shotguns, including a 10 gauge shotgun of unknown manufacture with no serial number, and a .410 gauge shotgun of unknown manufacture with no serial number. Each of the sawed-off shotguns had a barrel length of less than 26 inches and had not been registered to Defendant in the National Firearm Registration and Transfer Record.

6. A Remington 12 gauge shotgun, serial number W823059M.

Further investigation revealed that on May 6, 2013, Defendant sold a chainsaw to Gilbert's Sale Yard that matched the description of a chainsaw that had been stolen from Mr. Gallmeyer. On June 4, 2013, law enforcement learned that Defendant tried to sell a Colt .357 magnum revolver, serial number J63017, which had been stolen from Gilbert's Sale Yard, to another individual.

On July 9, 2013, during an out-of-custody interview conducted at his home, Defendant admitted to law enforcement that he had burglarized Gilbert's Sale Yard and had stolen the twenty-two firearms reported stolen from Gilbert's Sale Yard and seized from Defendant's home on July 4, 2013. Defendant also admitted to burglarizing his

stepmother's home and stealing tubs of coins and various other items from her home. When law enforcement went through the written inventory of property recovered from Defendant's home during the July 4 and July 9, 2013 searches, Defendant could not recall where he acquired the two long guns that were identified as having been stolen from Mr. Gallmeyer's home. As to the pistol recovered from Defendant's home that had been stolen from Mr. Gallmeyer's home, Defendant claimed to have acquired it some time previously from Dave Goddards, a friend of his who was deceased by the time of the interview. Defendant also admitted to altering two long guns by sawing off the barrels. He claimed that he altered the barrel of one of them when he was sixteen years old. He admitted to possessing those same two sawed-off shotguns.

Defendant did not admit to burglarizing Custom Wood Products or the home of Mr. Gallmeyer. Defendant did admit that he had known Mr. Gallmeyer and was able to provide a general description of him. Defendant referred to him as Carl Gallmeyer even though he went by and was known as Ken Gallmeyer. Defendant claimed that he had met Mr. Gallmeyer in 1999 or 2000 when Defendant was doing some work for Gerald Slessor at the River Ranch Campground in Nashua, Iowa. Mr. Gallmeyer was doing some bird watching. According to Defendant, he and Mr. Gallmeyer struck up a conversation. After initially stating that he had not seen Mr. Gallmeyer since then, Defendant recalled that he had seen him one other time at a grocery store in Charles City a few years prior. According to Defendant, Mr. Gallmeyer saw Defendant and approached him, recalling Defendant's last name accurately. According to Defendant, Mr. Gallmeyer, upon learning of Defendant's marriage to Wendi Patrie, was upset that he had not been invited to the wedding. Defendant professed to not knowing where Mr. Gallmeyer lived. In the context of talking about the investigation into the death of Mr. Gallmeyer and the physical evidence at Mr. Gallmeyer's home, Defendant told a law enforcement officer that he would not find Defendant's fingerprints at the crime scene. As the law enforcement officer continued to ask questions about Mr. Gallmeyer, Defendant's behavior changed. First,

Defendant became distracted with a wound on his hand. As law enforcement began to ask more questions about Mr. Gallmeyer's murder, Defendant asked if he could get a drink. Defendant told officers that he and Wendi Patrie had purchased their home in November 2012, which would have been about one and one half months after the burglary and murder of Mr. Gallmeyer. Defendant also told officers that sometime during the summer of 2012, Wendi Patrie had had some health problems and that they had accumulated significant medical bills. Defendant denied having anything to do with the murder of Mr. Gallmeyer.

During the early stages of the investigation, Wendi Patrie was interviewed by law enforcement numerous times about the firearms she purchased in 2010 and 2011 at Mills Fleet Farm. She admitted that Defendant was with her when they were purchased. Wendi Patrie admitted that she knew Defendant was a felon and that he could not have firearms. At times, she claimed the firearms were purchased by her for her protection; however, she could not provide an explanation for purchasing more than one firearm for purposes of protection. She also stated that she would use the firearms to hunt. However, she was unable to state how many firearms she purchased or name them by model or other description, and she was evasive when answering questions about who she had hunted with recently. Eventually, Wendi Patrie was charged in the United States District Court for the Northern District of Iowa, Case No. 6:13-CR-2025-LRR, with four federal crimes arising from her purchase of the long guns in 2010 and 2011: two counts of making a false statement during the purchase of a firearm (Counts 1 and 3), in violation of 18 U.S.C. § 922(a)(6), and two counts of transferring a firearm to a prohibited person (Counts 2 and 4), in violation of 18 U.S.C. § 922(d)(1). On December 30, 2013, she pled guilty to Count 1 after a debriefing with law enforcement during which she admitted that Defendant wanted her to buy the guns, Defendant advised her on the guns, Defendant paid for the guns and Defendant picked out the size and the length of the guns.

## B. *The Murder of Carl Kenneth Gallmeyer*

Mr. Gallmeyer was seventy years old at the time of his death and was retired after forty years working as a grocery store owner in Clarksville, Iowa. Mr. Gallmeyer was divorced and lived alone in a home he built just north of Nashua, Iowa. His home was about a mile and one half from the home of Gerald Slessor, another one of Defendant's burglary victims. Mr. Gallmeyer's home sat 200-300 yards back from the road at the end of a tree-lined lane. The house was not easily seen from the road. He did not own a dog. He enjoyed observing nature, feeding the wildlife and had an affinity for cats. He helped at the local animal shelter. Mr. Gallmeyer was concerned about security because his home was so secluded. Because of his fears, he had a dummy surveillance camera installed on the outside of the garage, armed himself with firearms and a night scope, bought a police scanner and put metal bars over his garage entry and the entryway to the kitchen in the front of the house. He generally had cash on hand in the house or in his wallet.

At the sentencing hearing on February 6, 2014, Seth Gallmeyer, Mr. Gallmeyer's son, credibly testified that Mr. Gallmeyer used to keep a large amount of cash and coins totaling $50,000 to $60,000 on his property in a safe in his garage. Mr. Gallmeyer believed that his then-second wife Judy Gallmeyer or her relatives stole $30,000 from the safe in 2006. Mr. Gallmeyer then divorced his wife and filed a lawsuit to recover the money. After the disappearance of the $30,000 and sometime prior to September 2012, Mr. Gallmeyer moved the safe to the office of Clark Insurance in Clarksville, Iowa, where it remained at the time of the burglary. The safe also contained photographs of Mr. Gallmeyer's firearms with the serial numbers listed as well as photographs of his tools. It was not common knowledge that he moved the safe off of his property. Mr. Gallmeyer also had a flat-screen television in his living room that was taken from his home and found in the possession of Defendant and his wife. It was mounted on their bedroom wall.

At the sentencing hearing, Denny Hamm, Defendant's uncle, credibly testified that approximately ten months before the murder of Mr. Gallmeyer, he had told Defendant that

Mr. Gallmeyer kept large amounts of cash in a safe at Mr. Gallmeyer's house. Hamm knew about the cash through his stepdaughter who is married to Judy Gallmeyer's grandson, Doug Griffin. Hamm told Defendant that Mr. Gallmeyer lived in the country and, later that day, as Hamm, Defendant and Wendi Patrie were driving home, Hamm pointed out where Mr. Gallmeyer lived. About three or four months before Mr. Gallmeyer's murder, Defendant asked Hamm if Mr. Gallmeyer had any dogs, and Hamm told him that he did not know. At some point thereafter, Hamm testified that Defendant told him that he had met Mr. Gallmeyer and gotten into his home to use the telephone after getting a flat tire or running out of gas, though Hamm did not believe that Defendant had actually had a flat tire or run out of gas. A week or two before the murder and burglary, Defendant asked Hamm if he would be interested in burglarizing Mr. Gallmeyer's home. After the murder, Hamm asked Defendant if he had anything to do with the burglary or murder. Defendant laughed and denied that he was responsible. Hamm also testified that he had seen a sawed-off shotgun in Defendant's house on a dresser over a year prior to the sentencing hearing.

Wendi Patrie credibly testified at the sentencing hearing that she heard Defendant ask Hamm if he would like to burglarize Mr. Gallmeyer's home a week or two before the murder of Mr. Gallmeyer. After this conversation and before the burglary and murder, Wendi Patrie testified that she, Defendant and Hamm were driving in the country taking Hamm somewhere when someone pointed out Mr. Gallmeyer's house. On September 26, 2012, Wendi Patrie woke up at 2:00 a.m., and neither Defendant nor his car were at their home. Defendant did not return that night. As Wendi Patrie was taking her daughter to school later that morning, she saw Defendant return home at a time when he should have been at work. Later that afternoon, Wendi Patrie testified that she saw Defendant unloading boxes from his car. Defendant's employer's records show that Defendant was sick and not at work on September 26 and 27, 2012.

In early October 2012, Wendi Patrie was watching the news with Defendant when the death of Mr. Gallmeyer was announced. Wendi Patrie testified that Defendant turned white and swallowed hard. In the following days, Wendi Patrie testified that she heard Hamm ask Defendant if he had anything to do with the burglary or murder.

When investigators searched Defendant's home in July 2013, they found firearms, a flat-screen television, tools, a chainsaw, a night vision scope and a dummy security camera minus the mounting bracket that was found in shards in Mr. Gallmeyer's driveway. Criminalist Victor Murillo testified that the shot wad found at the scene of the murder of Mr. Gallmeyer is consistent with what would have come from a .410 gauge shotgun shell. Murillo also testified that the shot wad found at the scene of the murder of Mr. Gallmeyer is consistent with having been fired out of a sawed-off shotgun. Murillo could not identify the shot wad found at the scene of the murder of Mr. Gallmeyer as having come out of the .410 gauge sawed-off shotgun in Defendant's possession, but he could not rule out the .410 gauge sawed-off shotgun in Defendant's possession as the murder weapon, either.

On October 4, 2012, law enforcement found Mr. Gallmeyer's body at his rural Nashua, Iowa home. Law enforcement determined that Mr. Gallmeyer was murdered sometime after the afternoon of September 25, 2012, and prior to the time his mail and newspaper were delivered to his home on September 26, 2012. A surveillance tape showed him visiting his former wife, Judy Gallmeyer, at her place of employment at the Kwik Star in Nashua, Iowa, at approximately 3:40 p.m. on September 25, 2012. Mr. Gallmeyer's mail carrier told law enforcement that when he delivered the mail to Mr. Gallmeyer's home on September 26, 2012, the mail from the previous day was uncharacteristically still in the mailbox. Mail continued to accumulate on the days that followed until Mr. Gallmeyer's body was discovered on October 4, 2012. Also in the mailbox was a newspaper dated September 26, 2012.

Mr. Gallmeyer's body was found in a natural sleeping position on his bed, lying on his left side, with the covers over the lower part of his body. There was a single gunshot

wound from a .410 gauge shotgun in Mr. Gallmeyer's right temple and blood splatter consistent with Mr. Gallmeyer being murdered where he lay on his bed. There were many items examined and then discarded on top of Mr. Gallmeyer after he was shot, including books, a bookcase and other items. The rest of the house, including the garage, was ransacked, with drawers pulled out and shelves tipped over. Nearly everything in the house had been searched. No DNA or fingerprints, aside from those of Mr. Gallmeyer, were developed from Mr. Gallmeyer's home.

## VI. ISSUES

The instant Sentencing Memorandum addresses the following issues: (1) Defendant's base offense level, specific offense characteristics and whether a cross reference applies pursuant to Chapter Two of the Guidelines; (2) whether Defendant played an aggravating role, pursuant to USSG § 3B1.1; (3) whether Defendant obstructed justice, pursuant to USSG §3C1.1; (4) whether Defendant accepted responsibility, pursuant to USSG §3E1.1; (5) whether Defendant qualifies as a career offender, pursuant to USSG §4B1.1 (PSIR ¶ 36); (6) whether Defendant qualifies as an armed career criminal, pursuant to USSG §4B1.4 (PSIR ¶ 37); and (7) whether the court should depart from the advisory Guidelines range pursuant to USSG §§4A1.3(a), 5K2.0 and 5K2.1 (PSIR ¶ 127).

As provided in USSG §1B1.1, the Sentencing Memorandum first determines Defendant's base offense level, applies any appropriate specific offense characteristics and determines if a cross reference applies as described in Chapter Two of the Guidelines. Next, the court will determine whether Defendant is subject to an aggravating role adjustment, obstruction of justice adjustment and whether he has demonstrated acceptance of responsibility, all of which are described in Chapter Three of the Guidelines. After determining the base offense level, considering the specific offense characteristics and whether a cross reference applies, and resolving Chapter Three adjustments, the court will turn to Chapter Four issues, specifically whether Defendant is a career offender and/or an armed career criminal. After determining whether any Chapter Four enhancements apply,

the court will determine the Guidelines range that corresponds to Defendant's offense level and criminal history category. With the pre-departure Guidelines range calculated, the court will then address the government's request for departures.

The government bears the burden of proof on aggravating role and obstruction of justice adjustments, career offender and armed career criminal status and upward departure issues. *See United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2001) (stating that the government bears the burden to prove sentencing enhancements). A defendant "has the burden to establish that he has clearly demonstrated that he is entitled to a two-level reduction in his offense level for acceptance of responsibility." *United States v. Herron*, 539 F.3d 881, 887-88 (8th Cir. 2008) (citing USSG §3E1.1(a)).

## VII. BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS

The parties do not dispute the PSIR's calculation of Defendant's base offense level of 26, pursuant to USSG §2K2.1 of the Guidelines. *See* PSIR ¶ 26. The parties also do not dispute that, given the specific offense characteristics, Defendant's adjusted offense level is 33. *Id.* ¶¶ 27-31. The court finds that the PSIR correctly calculated Defendant's offense level, considering only Defendant's base offense level and the specific offense characteristics pursuant to Chapter Two of the Guidelines. *See Beatty*, 9 F.3d at 690. However, before proceeding to Chapter Three of the Guidelines, the court finds it necessary to consider whether a cross reference applies, pursuant to USSG §2K2.1(c).

### A. Cross Reference

Pursuant to USSG §2K2.1(c)(1), "[i]f the defendant used or possessed any firearm or ammunition in connection with . . . another offense . . . , apply— . . . (B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above." USSG §2K2.1(c)(1). *See United States v. Tunley*, 664 F.3d 1260, 1265 (8th Cir. 2012) (affirming the district court's application of the USSG §2K2.1(c)(1)(B) cross reference); *United States v. Rashaw*, 170 F. App'x 986, 987 (8th Cir. 2006) (per curiam) (similar).

"[T]he application of a cross reference on the basis of judge found facts [is proper] so long as those facts are proven by a preponderance of the evidence and the guidelines are used in an advisory manner." *United States v. Howell*, 606 F.3d 960, 963 (8th Cir. 2010); *see also United States v. Garcia-Gonon*, 433 F.3d 587, 593 (8th Cir. 2006); *United States v. Red Elk*, 426 F.3d 948, 951 (8th Cir. 2005). "'Another offense', for purposes of subsection (c)(1), means any federal, state, or local offense . . . , regardless of whether a criminal charge was brought, or a conviction obtained." USSG §2K2.1, comment. (n.14(C)). The court may find "sentencing-enhancing facts," including whether death resulted from the commission of another offense, "by a preponderance of the evidence." *Rashaw*, 170 F. App'x at 987.

The court finds, by a preponderance of the evidence, that Defendant used a firearm, that is, a .410 gauge sawed-off shotgun, in connection with another offense, that is, burglary, and the death of Mr. Gallmeyer resulted from Defendant's commission of burglary. *See* USSG §2K2.1(c)(1)(B). Defendant has a history of burglaries and admitted to stealing firearms from a federally licensed firearms dealer. Defendant had long planned to burglarize Mr. Gallmeyer's home, as evidenced by his conversations with Hamm, which Wendi Patrie overheard. Defendant was alerted to Mr. Gallmeyer as a target when Hamm told him about a prior incident wherein Mr. Gallmeyer's then-wife and her relatives were reported to have stolen thousands of dollars in cash from a safe Mr. Gallmeyer kept in his home. Defendant knew where Mr. Gallmeyer lived. Defendant told Hamm he had actually entered Mr. Gallmeyer's home to use the telephone and thus was able to case the house, determine if Mr. Gallmeyer had a dog and determine what could be seen of Mr. Gallmeyer's home from the road. Defendant had motive to commit the burglary of Mr. Gallmeyer's home—his greed and need for money to defray his wife's medical bills.

Defendant and his car were gone on the night of the murder and Defendant was seen unloading boxes from his car the next day. Defendant was not at work on either of the next two days. Numerous items that had been stolen from Mr. Gallmeyer were found in

Defendant's home, including multiple firearms, a flat-screen television, a police scanner, a dummy surveillance camera and a night vision scope. Along with these items were other items that had been stolen during the course of other burglaries in the area. A .410 gauge sawed-off shotgun was also found in Defendant's home, which the court concludes, by a preponderance of the evidence, is the murder weapon. When Defendant learned that Mr. Gallmeyer had been found dead, his face turned white and he swallowed hard. Law enforcement has not been able to identify any other potential suspects of the burglary-murder and Defendant provided false leads. Thus, the court finds, by a preponderance of the evidence, that Defendant committed the offense of burglary because he entered an occupied structure, that is, Mr. Gallmeyer's home, with no license or privilege to do so, with the intent to commit a theft. *See* Iowa Code § 713.1 (defining burglary). Since Mr. Gallmeyer's death resulted from Defendant's commission of burglary and Defendant used and possessed a firearm in connection with the burglary, it is necessary to determine "the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide)." USSG §2K2.1(c)(1)(B).

### 1.    *Analogous offense*

The offenses listed in Chapter Two, Part A, Subpart 1 of the Guidelines include first degree murder (§2A1.1); second degree murder (§2A1.2); voluntary manslaughter (§2A1.3); involuntary manslaughter (§2A1.4); and conspiracy or solicitation to commit murder (§2A1.5).

Murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). The government may prove malice aforethought by showing a defendant's "intent at the time of a killing willfully to take the life of a human being or an intent willfully to act in callous and wanton disregard of the consequence of human life." *United States v. Johnson*, 879 F.2d 331, 334 (8th Cir. 1989) (internal quotation marks omitted); *see also id.* ("Malice may be established by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care,

of such a nature that a jury is warranted in inferring that [a] defendant was aware of a serious risk of death or serious bodily harm.'" (quoting *United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir. 1978))). "Every murder perpetrated by . . . any . . . kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of . . . any . . . burglary[] or robbery . . . is murder in the first degree." 18 U.S.C. § 1111(a). "Any other murder is murder in the second degree." *Id.* In determining whether the murder was "willful, deliberate, malicious, and premeditated," the court focuses on the following nonexclusive factors:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity*; (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*United States v. Downs*, 56 F.3d 973, 975 (8th Cir. 1995) (quoting *United States v. Blue Thunder*, 604 F.2d 550, 553 (8th Cir. 1979)) (internal quotation marks omitted). "[P]roof of premeditation [does] not require the government to show that the defendant deliberated for any particular length of time." *United States v. Slader*, 791 F.2d 655, 657 (8th Cir. 1986).

"Manslaughter is the unlawful killing of a human being without malice." 18 U.S.C. § 1112(a). Manslaughter is "voluntary" if it is committed "[u]pon a sudden quarrel or heat of passion." *Id.* Manslaughter is "involuntary" if it is committed "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." *Id.*

## 2. Parties' arguments

The government argues that the court should depart upward pursuant to USSG §5K2.1 because Defendant murdered Mr. Gallmeyer with a sawed-off shotgun. In the alternative, the government argues that a cross reference is appropriate pursuant to USSG §2K2.1(c)(1)(B). With respect to the cross reference, the government argues that "the evidence will show [that] [D]efendant murdered [Mr. Gallmeyer] with premeditation and malice aforethought, during the commission of a felony burglary, such that he would be guilty of First Degree Murder." Government's Sentencing Memorandum at 38.

Defendant argues that "[t]he [g]overnment has not established by the appropriate standard of proof that . . . Defendant murdered [Mr. Gallmeyer] and there should be no upward variance based on that allegation." Defendant's Post-Hearing Brief at 6.

## 3. Application

The evidence in the record establishes, by a preponderance of the evidence, that Defendant murdered Mr. Gallmeyer on or about September 25, 2012. Defendant committed the murder with malice aforethought by exhibiting conduct which was "'reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that [the court] is warranted in inferring that [Defendant] was aware of a serious risk of death or serious bodily harm.'" *Johnson*, 879 F.2d at 334 (quoting *Black Elk*, 579 F.2d at 51). By going to Mr. Gallmeyer's home with a .410 gauge sawed-off shotgun and ammunition for the same with the intent to commit a burglary, it is clear that Defendant exhibited reckless and wanton conduct and that he was aware that someone might die or suffer serious bodily harm. Although this conduct satisfies the definition of second degree murder, *see Johnson*, 879 F.2d at 334, the evidence in the record also establishes, by a preponderance of the evidence, that Defendant committed first degree murder. With regard to Mr. Gallmeyer's death, the evidence in the record is as follows: Mr. Gallmeyer was last seen on September 25, 2012, and did not retrieve his mail or newspapers after that date. On or about the night of September 25, 2012, or in the early morning hours of

September 26, 2012, Defendant retrieved a garage-door opener from Mr. Gallmeyer's truck that was parked in his driveway and entered Mr. Gallmeyer's garage. On October 4, 2012, law enforcement found Mr. Gallmeyer's body at his rural Nashua, Iowa home. His body was in a natural sleeping position on his bed, lying on his left side, with the covers over the lower part of his body. There was a single gunshot wound from a .410 gauge shotgun shell in Mr. Gallmeyer's right temple and blood splatter consistent with Mr. Gallmeyer being murdered where he lay on his bed. There were many items examined and then discarded on top of Mr. Gallmeyer after he was shot, including books, a bookcase and other items. The rest of the house, including the garage, was ransacked, with drawers pulled out and shelves tipped over. Nearly everything in the house had been searched. Law enforcement determined that Mr. Gallmeyer died on or about September 25, 2012. No DNA or fingerprints, aside from those of Mr. Gallmeyer, were developed from Mr. Gallmeyer's home.

The court concludes, by a preponderance of the evidence, that Defendant willfully, deliberately, maliciously and with premeditation murdered Mr. Gallmeyer, making it first degree murder. Although there is less evidence in the record indicating planning activity or Defendant's motive to murder Mr. Gallmeyer, the court finds that the details of the burglary and killing indicate that it was done with premeditation. *See Downs*, 56 F.3d at 975.

This conclusion is consistent with the facts of this case. At the time Defendant went to Mr. Gallmeyer's home, he was in need of money as his wife had just gone through an expensive medical operation. Defendant thought that there was a large amount of money in a safe in Mr. Gallmeyer's home based on his conversations with Hamm. Defendant retrieved a garage-door opener from Mr. Gallmeyer's car that was apparently unlocked in the driveway and entered through the garage. Defendant eventually entered the home in hopes of finding the safe or other items that he could steal and sell. At some point, Defendant saw that Mr. Gallmeyer was sleeping in his bed and decided to murder him.

Defendant did so because he needed to ransack the rest of Mr. Gallmeyer's home to find what he was looking for, that is, the safe and other valuable items. If Mr. Gallmeyer were to wake up while Defendant was searching Mr. Gallmeyer's home, Mr. Gallmeyer could have recognized Defendant from their previous meeting and, potentially, he could have used one of his three firearms to defend himself against Defendant. Therefore, Defendant willfully, deliberately, maliciously and with the requisite premeditation, which need not be proved "for any particular length of time," *Slader*, 791 F.2d at 657, murdered Mr. Gallmeyer by discharging a .410 gauge sawed-off shotgun at Mr. Gallmeyer's right temple.

Accordingly, the court finds, by a preponderance of the evidence, that Defendant committed first degree murder.[2] First degree murder has a base offense level of 43. Since 43 is greater than the offense level calculated pursuant to USSG §2K2.1(a)-(b), that is, 33, Defendant's resulting offense level is 43.[3]

_____

[2] Since the court has found that Defendant committed premeditated murder, which qualifies as first degree murder, it need not determine whether Defendant also committed felony murder, which may serve as another basis for first degree murder. *See* 18 U.S.C. § 1111(a) ("Every murder . . . committed in the perpetration of . . . any . . . burglary [] or robbery . . . is murder in the first degree."). However, the court notes that both the Seventh and Tenth Circuit Courts of Appeals have held that to qualify for a felony murder for purposes of USSG §2A1.1, "the defendant's offense of conviction must serve as a predicate felony under 18 U.S.C. § 1111(a)." *United States v. Thomas*, 280 F.3d 1149, 1157 (7th Cir. 2002); *see also United States v. Fortier*, 180 F.3d 1217, 1226 (10th Cir. 1999) (holding that neither of the defendant's convictions could serve as a predicate offense for purposes of the felony-murder rule because neither "one of these offenses comes even close to the predicate felonies described in [18 U.S.C. §] 1111(a)"). In this case, neither one of Defendant's offenses of conviction—possession of firearms by a felon and possession of sawed-off shotguns—could serve as a predicate offense for purposes of the felony-murder rule.

[3] In the event the Eighth Circuit finds that Defendant only committed second degree murder, Defendant's base offense level would be 38. *See* USSG §2A1.2.

## VIII.  CHAPTER THREE ADJUSTMENTS

Since "the offense level is determined by reference to another guideline . . . , the adjustments in Chapter Three (Adjustments) also are determined in respect to the referenced offense guideline."  USSG §1B1.5(c).[4]  Therefore, the court will determine whether Chapter Three Adjustments apply in reference to Defendant's murder of Mr. Gallmeyer.

### A.  Aggravating Role

The government contends that Defendant played an aggravating role with respect to his possession of firearms as a felon because he directed his wife to purchase firearms for him.  However, because the cross reference to homicide, and specifically first degree murder, applies, the court concludes that there is no aggravating role adjustment.  Defendant committed the murder of Mr. Gallmeyer by himself and was not "an organizer, leader, manager, or supervisor" of anyone with respect to the murder of Mr. Gallmeyer.  *See* USSG §3B1.1(c).

---

[4] In their Sentencing Memoranda and Post-Hearing Briefs, the parties dispute whether Defendant should be subject to an aggravating role adjustment, pursuant to Chapter Three, Part B, of the Guidelines.  Until recently, the parties also agreed that no obstruction of justice adjustment applies, pursuant to Chapter Three, Part C, of the Guidelines.  However, the government now requests an obstruction of justice adjustment based on information revealed to it shortly before the sentencing hearing and argues that Defendant has not accepted responsibility.

Since the government made these arguments with reference to Defendant's violations of the statutory provisions encompassed in USSG §2K2.1, and not in relation to the cross reference—first degree murder—described in USSG §2A1.1, the court only considers the parties' arguments regarding Chapter Three Adjustments to the extent they are relevant to Defendant committing first degree murder.  *See* USSG §1B1.5.  However, the court notes that its decision with respect to obstruction of justice and acceptance of responsibility would be the same whether analyzed based on the first degree murder cross reference or based on the offenses of conviction and the relevant conduct of the offenses of conviction, as more fully discussed below.

## B. Obstruction of Justice

### 1. Parties' arguments

At the sentencing hearing, the government suggested for the first time that Defendant obstructed justice pursuant to USSG §3C1.1 and, therefore, the court should increase his offense level by two levels. *See* Government's Post-Hearing Brief at 8. Specifically, the government asserts that after Defendant was arrested on federal charges, he provided false exculpatory evidence through his attorneys to law enforcement officers, that is, the names of two people from whom he claimed to have purchased the property that previously belonged to Mr. Gallmeyer. Law enforcement investigated these two persons and they related their whereabouts during the relevant time period. Law enforcement officers verified their stories and "determined that neither of the persons could have committed the burglary [of Mr. Gallmeyer's home] as each was in drug treatment and [was] accounted for on the day of and the day after the murder." *Id.* at 8. The government states that it "did not previously object to the [G]uidelines' calculation because the agents were only able to conduct the interviews shortly before the [sentencing] hearing." *Id.* at 8. Defendant did not respond to the government's obstruction of justice argument in Defendant's Post-Hearing Brief.

### 2. Applicable law

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

USSG §3C1.1. The commentary to USSG §3C1.1 provides many examples of obstructive conduct, including "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." *Id.*, comment. (n.4(G)); *see also United States v. Finck*, 407 F.3d 908, 913 (8th

Cir. 2005).  "[B]efore imposing an enhancement under §3C1.1, a district court 'must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice.'"  *United States v. Brooks*, 174 F.3d 950, 958 (8th Cir. 1999) (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)).  It is error to find "obstruction of justice enhancements where the government failed to provide evidence that the false statement actually impeded the investigation."  *Finck*, 407 F.3d at 914.  However, if "the government provide[s] testimony during sentencing to establish how [a defendant's] false statement . . . caused law enforcement to expend unnecessary resources," then the false statement, if made willfully, may constitute obstruction of justice. *Id.*

### 3.    *Application*

In this case, Iowa Division of Criminal Investigation Special Agent Scott Reger testified at the sentencing hearing that Defendant stated that he had received some of the property belonging to Mr. Gallmeyer from Augustus Meyer and Adam Fish.  After interviewing Meyer and Fish and following up on their stories, law enforcement determined that these individuals could not have been the ones that committed the burglary of Mr. Gallmeyer's home and the murder of Mr. Gallmeyer.  In the Government's Post-Hearing Brief, the government states that Defendant's false leads "significantly obstructed and impeded the investigation, necessitating the diversion of resources to interview witnesses and obtain records to rebut [D]efendant's false leads."  Government's Post-Hearing Brief at 8.

The court finds, by a preponderance of the evidence, that by providing two false leads to law enforcement, Defendant "willfully obstructed . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the [D]efendant's instant offense of conviction, and . . . the obstructive conduct related to . . . [Defendant's] offense of conviction and any relevant conduct."  USSG § 3C1.1.  Pursuant to USSG §1B1.5(c), this determination is made in reference to the murder of Mr. Gallmeyer.  *See* USSG

§1B1.5(c).[5] Although Defendant initially claimed that he got one of the firearms that was stolen from Mr. Gallmeyer's home from Dave Goddards, who was at the time of the interview deceased, he denied knowing how he came into possession of the other two firearms that were stolen from Mr. Gallmeyer's home. Later, after he was charged, he told law enforcement that he had received some of Mr. Gallmeyer's property that was found in his home from Meyer and Fish. To determine whether Defendant burglarized Mr. Gallmeyer's home and murdered him, law enforcement was required to investigate these leads, which required expending resources. Without Defendant providing false exculpatory evidence, the government would not have been required to expend resources and would have been able to conclusively determine that Defendant committed the burglary and murder at an earlier time. Accordingly, the court finds that Defendant obstructed justice with respect to the investigation into and prosecution of Mr. Gallmeyer's murderer, which in fact was Defendant and, similarly, he attempted to obstruct his sentencing by minimizing the extent of his conduct. *See* USSG § 3C1.1; *see also Finck*, 407 F.3d at 914. Therefore, Defendant's offense level is increased by two levels.[6]

---

[5] If the Eighth Circuit finds that the court erred by applying the obstruction of justice adjustment to the cross reference for first degree murder, the court would still find that Defendant obstructed justice with regard to Counts 3 and 4 of the Indictment because, by providing law enforcement with the names of persons from whom Defendant claimed to have received the items stolen from Mr. Gallmeyer, when in fact these persons could not have committed the burglary of Mr. Gallmeyer, Defendant obstructed justice and did not accept responsibility with regard to relevant conduct, that is, the burglary of Mr. Gallmeyer's home and the murder of Mr. Gallmeyer.

[6] Thus, Defendant's actual total offense level is 45. However, the court notes that "[a]n offense level of more than 43 is to be treated as an offense level of 43." USSG §5A comment. (n.2). In the event the Eighth Circuit finds that Defendant only committed second degree murder, the court would apply a two-level obstruction of justice adjustment.

## C. *Acceptance of Responsibility*

### 1. *Parties' arguments*

In the Government's Post-Hearing Brief, the government argues that "[a]n obstruction of justice enhancement would jeopardize . . . [D]efendant's reduction for acceptance of responsibility." Government's Post-Hearing Brief at 8. Defendant did not respond to this argument.

### 2. *Applicable law*

Pursuant to USSG §3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." USSG §3E1.1(a). Application Note 1 provides that the court should consider multiple factors when determining whether the defendant has clearly demonstrated acceptance of responsibility, including whether the defendant has "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)." USSG §3E1.1, comment. (n.1(A)). The Application Note goes on to state that "[c]onduct resulting in an enhancement under §3C1.1 (Obstruction . . . ) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." USSG §3E1.1, comment. (n.4); *see also United States v. Smith*, 665 F.3d 951, 957 (8th Cir. 2011) ("Ordinarily, a defendant who obstructs justice is not entitled to the reduction for acceptance of responsibility."). "Only in 'extraordinary cases' will defendants found to have obstructed justice 'be eligible for the acceptance of responsibility reduction.'" *United States v. Hutterer*, 706 F.3d 921, 925 (8th Cir. 2013) (quoting *Smith*, 665 F.3d at 957). When determining if the case is an extraordinary case, courts look at whether

> the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution[,] . . . whether [the defendant] voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement . . . [and] whether

> [the defendant] admitted and recanted his obstructive conduct,
> or whether he denied the obstruction of justice at sentencing.

*United States v. Honken*, 184 F.3d 961, 968 (8th Cir. 1999).

### 3. *Application*

When analyzed with respect to the actual offenses of conviction, that is, possession of firearms as a felon and possession of sawed-off shotguns, the burglary of Mr. Gallmeyer's home and the murder of Mr. Gallmeyer are relevant conduct because Defendant used a .410 gauge sawed-off shotgun in the perpetration of the burglary and murder, and the use of that firearm was in violation of both offenses of conviction. Defendant could have remained silent with regard to this relevant conduct, that is, the burglary of Mr. Gallmeyer's home and the murder of Mr. Gallmeyer. *See* USSG §3E1.1, comment. (n.1(A)). However, Defendant denied to law enforcement that he had any involvement with the burglary of Mr. Gallmeyer's home and the murder of Mr. Gallmeyer. Also, by providing false exculpatory evidence in the form of names of persons from whom he claimed to have acquired the stolen items from Mr. Gallmeyer's home, Defendant falsely denied in his interview with law enforcement that he was the one who committed the burglary of Mr. Gallmeyer's home and the murder of Mr. Gallmeyer. Moreover, the court has found that Defendant obstructed justice with regard to the investigation and prosecution of the murderer of Mr. Gallmeyer, or, in the alternative, with respect to the sentencing of the instant offenses of conviction, which "ordinarily indicates that defendant has not accepted responsibility for his criminal conduct." USSG §3E1.1, comment. (n.4).

This is not an "extraordinary" case where the Defendant could be found to have obstructed justice and accepted responsibility. Although the obstruction of justice was an isolated event, he never recanted his statements and only after law enforcement investigated his leads was it able to determine that the leads were false. Accordingly, the

court finds that Defendant has not carried his burden of proof relative to acceptance of responsibility.

## IX.  CHAPTER FOUR ADJUSTMENTS

The parties dispute whether Defendant qualifies as a career offender, pursuant to USSG §4B1.1, and whether Defendant qualifies as an armed career criminal, pursuant to USSG §4B1.4.  The court now turns to address these issues.

### A.  Career Offender

USSG §4B1.1(a) provides the definition of a career offender:

> (a)  A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

USSG §4B1.1(a).  Defendant concedes that the government has proved subsection (1), but Defendant disputes subsections (2) and (3).

#### 1.  Crime of violence

##### a.  Parties' arguments

Defendant contends that neither the crime of possession of firearms by a felon as an armed career criminal nor possession of sawed-off shotguns are crimes of violence. Defendant bases the latter argument on what he calls an "inconsistency" in the Guidelines. Essentially, Defendant argues that if possession of a sawed-off shotgun is a crime of violence, as the commentary to USSG §4B1.2 suggests, then anyone who possessed a sawed-off shotgun with two prior felony convictions of a crime of violence or a serious drug offense would be a career offender pursuant to USSG §4B1.1.  According to Defendant, this would render USSG §2K2.1 irrelevant, because anyone meeting the criteria of USSG §2K2.1 would also meet the criteria for career offender.  Defendant argues that USSG §4B1.2 must be wrong.

The government argues that Defendant's reading of the Guidelines is incorrect. The government contends that there are additional elements necessary to be a career offender that are not present in USSG §2K2.1, including the requirement that the defendant be eighteen years old. Moreover, the government states that it "could find no reported case or published journal or article that supports [D]efendant's perception of an inconsistency or conflict between these guidelines provisions" and that "the Eighth Circuit Court of Appeals has repeatedly held that possession of a sawed-off shotgun is a qualifying crime of violence pursuant to the career offender guidelines." Government's Sentencing Memorandum at 10.

### b. Applicable law and application

The Eighth Circuit has repeatedly held that possession of a sawed-off shotgun is a crime of violence. *See, e.g.*, *United States v. Vincent*, 575 F.3d 820, 825-26 (8th Cir. 2009); *United States v. Clark*, 563 F.3d 771, 773 (8th Cir. 2009); *United States v. Allegree*, 175 F.3d 648, 651 (8th Cir. 1999). In addition, the commentary to USSG §4B1.2 states explicitly that the possession of a firearm described in 26 U.S.C. § 5845(a) is a "crime of violence" with respect to the career offender guidelines. USSG §4B1.2, comment. (n.1).

The court finds that possession of a sawed-off shotgun is a crime of violence. Since Defendant pled guilty to this offense, the government has shown by a preponderance of the evidence that it has satisfied subsection (2) of the career offender guidelines.

### 2. Predicate offenses

### a. State drug offense

### i. Parties' arguments

Defendant argues that his state drug conviction described in paragraph 47 of the PSIR does not qualify as a predicate offense with respect to the career offender guidelines. Defendant bases his argument on 28 U.S.C. § 994(h) and whether "[t]he United States Sentencing Commission has exceeded its authority in creating a career offender definition

that includes state court drug convictions." Defendant's Sentencing Memorandum at 17-20; *see also* PSIR ¶ 47. Defendant acknowledges that his position is contrary to Eighth Circuit law. In addition, Defendant argues that if the court does not adopt his position that the United States Sentencing Commission exceeded its authority, the court should consider a downward variance because the small drug quantity involved in the state court conviction likely would not have led to a federal prosecution. Defendant also contends that the timing of the state court conviction warrants a downward variance because it was within two months of the time limitation for scoring predicate offenses under the advisory Guidelines.[7]

The government argues that it is settled law that the United States Sentencing Commission has the authority to define career offender to include state court convictions.

### ii. Applicable law

28 U.S.C. § 994(h) provides:

> (h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
>
> (1) has been convicted of a felony that is—
>
> (A) a crime of violence; or
>
> (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955 and 959), and chapter 705 of title 46; and
>
> (2) has previously been convicted of two or more prior felonies, each of which is—

---

[7] The court will consider motions for variance when the sentencing hearing reconvenes.

> (A)   a crime of violence; or
>
> (B)   an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955 and 959), and chapter 705 of title 46.

28 U.S.C. § 994(h).  Seizing on this authority, the United States Sentencing Commission defined a "controlled substance offense," with respect to the career offender guidelines, to mean

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense.

USSG §4B1.2(b).  The Eighth Circuit has stated that 28 U.S.C. § 994(h)(2)(B) "authorizes the Sentencing Commission to define a career offender as a person with earlier state-law convictions for conduct that could have been charged under the listed federal statutes." *United States v. Consuegra*, 22 F.3d 788, 790 (8th Cir. 1994).  The court is aware of no circuit court of appeals that has arrived at a different conclusion with respect to state drug convictions.  Also, Congress has failed to act to revise the Guidelines since the Eighth Circuit's decision in *Consuegra*.

### iii.   Application

On May 28, 1996, Defendant was sentenced in the Iowa District Court for Floyd County, Case No. 9895-0695, to ten years in prison for distributing approximately 1/8 gram of methamphetamine to a confidential informant.  *See* Government's Exhibit 22 (docket no. 49-4) at 1.  Since methamphetamine is a Schedule II controlled substance pursuant to 21 U.S.C. § 812, *see United States v. Guzman*, 707 F.3d 938, 939 (8th Cir.

2013), and 21 U.S.C. § 841 prohibits the distribution of a controlled substance, including methamphetamine, Defendant could have been charged under a federal statute for his distribution of methamphetamine. Moreover, Defendant's state drug conviction satisfies the unambiguous language of USSG §4B1.2(b), which has been upheld by every circuit court of appeals that has considered it. *See Consuegra*, 22 F.3d at 790; *United States v. Beasley*, 12 F.3d 280, 283-84 (1st Cir. 1993); *United States v. Pearson*, 77 F.3d 675, 677 (2d Cir. 1996); *United States v. Whyte*, 892 F.3d 1170, 1174 (3d Cir. 1989); *United States v. Brown*, 23 F.3d 839, 841 (4th Cir. 1994); *United States v. Najar*, No. 98-2050, 2000 WL 799331, at *3 (6th Cir. June 9, 2000); *United States v. Rivera*, 996 F.2d 993, 995-97 (9th Cir. 1993); *United States v. Gonzales*, 121 F.3d 1416, 1419 (11th Cir. 1997). Defendant's 1996 state drug offense serves as a predicate offense to Defendant's classification as a career offender.

### b.    *Burglary*

Defendant objects to the scoring of his May 27, 2003 third degree burglary conviction as a predicate offense because it was not a burglary of a dwelling. *See* PSIR ¶ 51; Defendant's Sentencing Memorandum at 7. Defendant concedes that his argument is contrary to Eighth Circuit law. The government argues that even a burglary of a commercial building constitutes a "crime of violence" for purposes of USSG §4B1.1.

In *United States v. Bell*, 445 F.3d 1086 (8th Cir. 2006), the Eighth Circuit squarely addressed this issue and concluded that although "[the defendant's] prior conviction was for burglary of a commercial building, not a dwelling, the district court properly followed our many decisions holding that commercial burglaries are crimes of violence under the 'otherwise involves' provision in [USSG] §4B1.2(a)." *Id.* at 1088. To the extent Defendant argues that his May 27, 2003 burglary conviction does not qualify as a predicate offense because Iowa's burglary statute is broader than the generic definition of burglary, the court addresses this argument and concludes that Defendant's third degree burglary conviction qualifies as a predicate offense when discussing whether Defendant's third

degree burglary conviction qualifies as a predicate offense for purposes of Defendant being an armed career criminal in section IX.B.4.

It is undisputed that Defendant was convicted of the third degree burglary of Sherm's Place and The VFW, two commercial buildings, on May 27, 2003, and sentenced to five years in prison. Pursuant to Eighth Circuit law, this conviction qualifies as a "crime of violence" pursuant to USSG §4B1.1(a).

### 3. Conclusion

The court concludes, by a preponderance of the evidence, that Defendant is a career offender pursuant to USSG §4B1.1(a). However, the only instant offense to which the career offender guidelines apply is Count 4, possession of sawed-off shotguns, which carries a maximum sentence of ten years in prison. 26 U.S.C. § 5871. Therefore, pursuant to the table in §4B1.1(b), Defendant's offense level as a career offender is 24 and Defendant is Criminal History Category VI. However, since 24 is not greater than the offense level otherwise applicable, that is, 43, Defendant is a career offender with an offense level of 43 and he is Criminal History Category VI.

## B. Armed Career Criminal

Whether Defendant is an armed career criminal is crucial to Defendant's sentence because if Defendant is found to be an armed career criminal, he must be sentenced to a minimum of fifteen years in prison and he could be sentenced to a maximum of life in prison. *See* 18 U.S.C. § 924(e)(1). If Defendant is not found to be an armed career criminal, the maximum sentence he could receive is twenty years, which would result only in the event that the sentences on both counts were ordered to run consecutively. *See* 18 U.S.C. § 924(a)(2) (maximum of ten years for being a felon in possession of a firearm); 26 U.S.C. § 5871 (maximum of ten years for possessing a firearm described in 26 U.S.C. § 5845(a)). Defendant has multiple objections to being scored as an armed career criminal, which the court will address in turn.

### 1.  Unconstitutional judicial fact-finding

#### a.  Parties' arguments

Defendant argues that under *Alleyne v. United States*, __ U.S. __, 133 S. Ct. 2151 (2013), the court must not apply an armed career criminal enhancement if Defendant was not found guilty of the enhancement by a jury, did not plead guilty to the enhancement or did not stipulate to the enhancement.  However, Defendant acknowledges that his position is contrary to Eighth Circuit law.  The government agrees that Defendant's position is contrary to Eighth Circuit law and points out that "[e]very court that has addressed this argument post-*Alleyne* has rejected it."  Government's Sentencing Memorandum at 17 (citing *United States v. Evans*, 738 F.3d 935, 937 (8th Cir. 2014) (per curiam); *United States v. Blair*, 734 F.3d 218, 227-28 (3d Cir. 2013); *United States v. Croft*, 553 F. App'x 187, 188 (4th Cir. 2013) (per curiam)).

#### b.  Applicable law

In *Alleyne*, the Supreme Court stated that "*Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] concluded that any 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime."  *Id.* at 2160 (quoting *Apprendi*, 530 U.S. at 490).  In *Apprendi*, the Supreme Court arrived at this conclusion with reference to facts that increase a mandatory maximum, and in *Alleyne*, this principle was extended to facts that increase a mandatory minimum.  *See id.* at 2157-58.  However, the Supreme Court noted that "*Almendarez-Torres v. United States*, 523 U.S. 224 . . . (1998), . . . recognized a narrow exception to this general rule for the fact of a prior conviction."  *Id.* at 2160 n.1.

The Eighth Circuit, post-*Alleyne*, has addressed the argument that "because the prior convictions were not . . . proven beyond a reasonable doubt to a jury or admitted by [the defendant], the enhancement violated [the defendant's rights]."  *Evans*, 738 F.3d at 937.  The Eighth Circuit rejected that argument as contrary to the precedents of the Supreme Court and the Eighth Circuit, recognizing that "'fact[s] of prior conviction' need

not be submitted to the jury and proven beyond a reasonable doubt based on *Almendarez-Torres.*" *Id.* (first alteration in original) (quoting *Apprendi*, 530 U.S. at 489-90).

### c.    Application

Like the defendant in *Evans*, Defendant argues that a jury is required to determine whether he is subject to an enhancement based on his prior convictions. Defendant's position is contrary to Supreme Court law and Eighth Circuit law and, therefore, is rejected.

### 2.    Second degree burglary as a predicate offense

Defendant next contends that his convictions for burglary and attempted burglary reflected in paragraphs 42 and 44 of the PSIR, respectively, constitute at most one qualifying predicate offense when determining if Defendant is an armed career criminal. The government argues that the convictions reflected in paragraphs 42 and 44 of the PSIR constitute three qualifying predicate offenses. Before addressing whether these convictions should be considered as one, two or three qualifying predicate offenses, the court addresses Defendant's argument that his second degree burglary convictions described in paragraph 42 of the PSIR do not qualify as predicate offenses for purposes of 18 U.S.C. § 924(e)(1).

### a.    Parties' arguments

Defendant argues that his second degree burglary convictions described in paragraph 42 of the PSIR do not qualify as predicate offenses because the definition of burglary under Iowa law is broader than the generic definition of burglary adopted in *Taylor v. United States*, 495 U.S. 575 (1990). Specifically, Defendant argues that Iowa's burglary statute is broader than the generic definition of burglary because "it cover[s] situations where individuals had previously lawfully entered into and remained after it was closed to the public, and also broader in terms of covering 'appurtenances to buildings and structures, land, water or air vehicle.'" Defendant's Sentencing Memorandum at 8 (quoting Iowa Code § 702.12). Defendant also notes that numerous Iowa Supreme Court decisions have defined "appurtenance" broadly, beyond the generic burglary definition.

The government argues that "the Iowa burglary statute does not go beyond the generic definition of burglary because it requires that entry be unlawful and the term 'occupied structure' is not overbroad as compared with the generic definition of burglary." Government's Sentencing Memorandum at 25. The government relies on the categorical and modified categorical approaches discussed in *Descamps v. United States*, __ U.S. __, 133 S. Ct. 2276 (2013), in support of its argument.

### b.    *Applicable law*

"A defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an armed career criminal." USSG §4B1.4. Section 924(e) states, in pertinent part, as follows:

> (1)  In the case of a person who violates section 922(g) of this title and has three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years . . . .
>
> (2)  As used in this subsection—
>
> . . . .
>
> (B)    the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year . . . that—
>
> (i)  has an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e). The parties' dispute centers around whether Defendant's prior convictions are "violent felonies" as defined by 18 U.S.C. § 924(e)(2)(B)(i)-(ii), and with respect to this section of the Sentencing Memorandum, whether Defendant's prior convictions of second degree burglary are predicate offenses under the Armed Career Criminal Act ("ACCA").

In *Taylor*, the Supreme Court held that "a person has been convicted of burglary for purposes of a § 924(e) enhancement if he is convicted of any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor*, 495 U.S. at 599. However, as the Supreme Court noted in *Taylor*, "[t]here remains the problem of applying this [definition] to cases in which the state statute under which a defendant is convicted varies from the generic definition of 'burglary.'" *Id.* "If the state statute is narrower than the generic view, . . . there is no problem, because the conviction necessarily implies that the defendant has been found guilty of all the elements of generic burglary." *Id.* However, if a state statute "define[s] burglary more broadly," there is a question about whether a conviction under such statute can qualify as a predicate offense under 18 U.S.C. § 924(e). *Id.*

In *Descamps*, the Supreme Court clarified the steps that courts must take in determining whether a state burglary conviction, or some other state-defined offense, qualifies as a predicate offense under 18 U.S.C. § 924(e). In *Descamps*, the defendant was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). *Descamps*, 133 S. Ct. at 2282. The government sought an enhanced sentence under the ACCA, but the defendant "argued that his prior burglary conviction could not count as an ACCA predicate offense." *Id.* The defendant had previously pled guilty to violating California Penal Code Annotated § 459, which provides that "[e]very person who enters" certain locations "with intent to commit grand or petit larceny or any felony is guilty of burglary." *Id.* (quoting Cal. Penal Code Ann. § 459).

The Supreme Court held that the California statute was "an 'indivisible' statute—*i.e.*, one not containing alternative elements—that criminalizes a broader swath of conduct than the relevant generic offense," rather than a "'divisible statute' . . . [that] sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building *or* an automobile." *Descamps*, 133 S. Ct. at 2281. The Supreme Court stated that the California statute "does not require the entry to have been unlawful," which "goes beyond the normal, 'generic' definition of burglary." *Id.* at 2282.

The Supreme Court concluded that in the case of "indivisible" statutes—like California's, because it did not state alternative elements but rather criminalized more conduct than the generic burglary offense—courts must use the categorical approach in determining whether the elements of the state offense "are the same as, or narrower than, those of the generic offense," and in so doing, they must "compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime." *Id.* at 2281; *accord Olten v. United States*, No. 12-3629, 2014 WL 1924447, at *1 (8th Cir. May 15, 2014). In the case of California's burglary statute, the Supreme Court concluded that it was missing the "unlawful entry" aspect of the generic burglary offense and, therefore, could not serve as a predicate burglary offense "[b]ecause of the mismatch in elements, a person convicted under that statute is never convicted of the generic crime." *Id.* at 2292; *accord Olten*, 2014 WL 1924447, at *1.

However, the Supreme Court concluded that with respect to "divisible" statutes, courts can utilize a modified categorical approach. Pursuant to this approach,

> [i]f one alternative (say, a building) matches an element in the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction. The court can then do what the categorical approach demands: compare the

> elements of the crime of conviction (including the alternative
> element used in the case) with the elements of the generic
> crime.

*Id.* at 2281; *see also Johnson v. United States*, 559 U.S. 133, 144 (2010) ("[T]he 'modified categorical approach' that we have approved . . . permits a court to determine which statutory phrase was the basis of conviction by consulting the trial record—including charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms." (quoting *Nijhawan v. Holder*, 557 U.S. 29, 35 (2009))); *Nijhawan*, 557 U.S. at 35 (holding that when a statute names alternative places at which a burglary can take place, some of which qualify for the ACCA generic definition of burglary and some of which do not, a court can review extra-statutory materials to determine which statutory phrase supported the conviction); *Shepard v. United States*, 544 U.S. 13, 26 (2005) (allowing a sentencing court to inquire into plea agreements and plea colloquies to determine if a defendant, who pled guilty under a divisible statute, admitted the elements of the generic offense). In summary, the Supreme Court described the modified categorical approach as follows:

> If at least one, but not all of those crimes [listed in the statute] matches the generic version, a court needs a way to find out which the defendant was convicted of. That is the job, as we have always understood it, of the modified approach: to identify, from among several alternatives, the crime of conviction so that the court can compare it to the generic offense.

*Descamps*, 133 S. Ct. at 2285.

### c. *Application*

The Iowa Code defines burglary as follows:

> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or

privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Iowa Code § 713.1. The Iowa Code defines an "occupied structure" as follows:

> An "occupied structure" is any building, structure, appurtenances to buildings and structures, land, water or air vehicle, or similar place adapted for overnight accommodation of persons, or occupied by persons for the purpose of carrying on business or other activity therein, or for the storage or safekeeping of anything of value. Such a structure is an "occupied structure" whether or not a person is actually present. However, for purposes of chapter 713, a box, chest, safe, changer, or other object or device which is adapted or used for the deposit or storage of anything of value but which is too small or not designed to allow a person to physically enter or occupy is not an "occupied structure".

Iowa Code § 702.12. In comparison, the generic burglary definition identified in *Taylor* is "any crime regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor*, 495 U.S. at 599. As the Supreme Court stated in *Descamps*, under the categorical approach, "[t]he prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than, those of the generic offense." *Descamps*, 133 S. Ct. at 2281.

### i. *Categorical approach*

Although Defendant argues that Iowa's burglary statute is broader than the generic definition of burglary because "it cover[s] situations where individuals had previously lawfully entered into and remained after it was closed to the public," Defendant's Sentencing Memorandum at 8, the court finds that this is not the case. The plain language of the generic definition indicates that one could lawfully enter a building or structure and still be guilty of burglary if he remained in such building or structure with the intent to commit a crime unlawfully or without privilege. Moreover, the Eighth Circuit has already addressed this argument in *United States v. Olsson*, 742 F.3d 855 (8th Cir. 2014). In that

case, the Missouri burglary statute provides that "[a] person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein." *Id.* at 856 (quoting Mo. Rev. Stat. § 569.170). Clearly, under Missouri law, one could be convicted of burglary if he lawfully entered a building as long as he knowingly remained unlawfully. The Eighth Circuit held that "the basic elements of the Missouri second degree burglary statute are the same as those of the generic burglary offense," which implies that under the generic offense, one could be convicted of burglary even after they entered a building lawfully as long as they remained unlawfully, just as the plain language of the generic burglary definition suggests. *Id.*

Other parts of the Iowa burglary statute, however, are broader than the generic definition of burglary.[8] The term "occupied structure," as interpreted by the Iowa Supreme Court, includes a "driveway" or "step or stoop outside the door of a home, as well as the cement walkway leading to the step," *State v. Pace*, 602 N.W.2d 764, 770 (Iowa 1999), which is broader than the "building or structure" definition of the generic burglary offense. For this reason,[9] the court does not find that a burglary conviction under

---

[8] The court recognizes that in *United States v. Carpenter*, 11 F.3d 788 (8th Cir. 1993), the Eighth Circuit concluded that "second-degree burglary under Iowa law . . . qualifies as 'generic burglary' under the *Taylor* definition" because it includes "entry of a structure, intent to commit a felony, and no right, license, or privilege to do so." *Id.* at 791. However, *Carpenter* preceded *Descamps* and did not address the issue of whether "occupied structure" is defined more broadly under Iowa law than "building or structure" is with respect to the generic burglary definition.

[9] There may be other examples of how the definition of an "occupied structure" under Iowa law is broader than a "building or structure" with respect to the generic burglary definition, but the court need not address them at this time. It is enough that one acceptable definition of an "occupied structure" under Iowa law is not a crime under the generic burglary definition for Iowa's burglary statute to be considered overbroad with respect to the categorical approach.

Iowa law is a predicate offense for an armed career criminal enhancement under the categorical approach.[10]

## ii.    *Modified categorical approach*

The Iowa burglary statute is not an "indivisible" statute, but rather is one in which "one alternative . . . matches an element in the generic offense, but the other . . . does not," *Descamps*, 133 S. Ct. at 2281, making the statute "divisible." The Iowa burglary statute contains all of the elements of the generic burglary definition in the alternative—unlawful entry or remaining in a building or structure with intent to commit a crime—which distinguishes it from an overly broad "indivisible" statute where, "[b]ecause of the mismatch in elements, a person convicted under that statute is never

---

[10] The fact that Defendant was convicted of second degree burglary makes no difference. Under Iowa law, second degree burglary is defined as follows:

> 1.  A person commits burglary in the second degree in either of the following circumstances:
>
>> a.    While perpetrating a burglary in or upon an occupied structure in which no persons are present, the person has possession of an explosive or incendiary device or material, or a dangerous weapon, or a bodily injury results to any person.
>>
>> b.    While perpetrating a burglary in or upon an occupied structure in which one or more persons are present, the person does not have possession of an explosive or incendiary device or material, nor a dangerous weapon, and no bodily injury is caused to any person.

Iowa Code § 713.5(1). These criteria, one of which must be met for someone to be convicted of second degree burglary, do not narrow the otherwise overbroad nature of Iowa's burglary statute. One could still be convicted of second degree burglary under Iowa law of a place that does not qualify as a "building or structure" under the generic burglary definition.

convicted of the generic crime." *Id.* at 2292; *accord Olten*, 2014 WL 1924447, at *1. This makes a modified categorical approach appropriate. *See Descamps*, 133 S. Ct. at 2281; *accord United States v. Soileau*, 686 F.3d 861, 864 (8th Cir. 2010) ("However, 'when the statute giving rise to the conviction criminalizes both conduct that does and does not qualify as a violent felony[,]' courts apply a modified categorical approach." (alteration in original) (quoting *United States v. Webster*, 636 F.3d 916, 919 (8th Cir. 2011))). Under the modified categorical approach, courts may review "the charging document, jury instructions, plea agreement or plea hearing transcript, and comparable judicial records to determine whether the defendant was in fact convicted of a violent felony alternative." *United States v. Salean*, 583 F.3d 1059, 1061 (8th Cir. 2009). The court now turns to "compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime." *See Descamps*, 133 S. Ct. at 2281.

Two second degree burglary convictions are detailed in paragraph 42 of the PSIR. The Trial Information in *State v. Patrie*, No. CR17-1-91 (Iowa District Court for Chickasaw County, January 24, 1991) charged that Defendant did,

> break and enter, with the intent to commit a theft therein, the following occupied structures, to wit: Ray's Lumber, Alta Vista, Iowa; Art Coles Repair, Alta Vista, Iowa; Monfort, Inc., New Hampton, Iowa; RLR Auto., Lawler, Iowa; Rausch Brothers, Ionia, Iowa; Gerrie[']s Custom Upholstery, Ionia, Iowa.

Government's Exhibit 20 (docket no. 49-2) at 2. Defendant pled guilty to the burglaries of Gerrie's Upholstery and Rausch Brothers and he was sentenced "for a term not to exceed 10 years on each count to run concurrently." *Id.* at 4-5.

The court concludes that the Trial Information and Judgment (Government's Exhibit 20 at 4-5) demonstrate that Defendant's second degree burglary convictions included the necessary elements of the generic burglary definition: (1) unlawful entry or remaining—because Defendant was charged with and pled guilty to breaking and entering;

(2) intent to commit a felony therein—because Defendant was charged with breaking and entering with intent to commit a felony therein; and (3) a building or other structure—because Gerrie's Upholstery and Rausch Brothers were local businesses that satisfy the generic burglary definition of "building or structure." Accordingly, Defendant's two second degree burglary convictions, for which he was sentenced on March 25, 1991, serve as at least one armed career criminal predicate offense. The court now turns to consider whether these two burglary convictions were "committed on occasions different from one another," which is a requirement for multiple convictions to serve as multiple predicate offenses pursuant to 18 U.S.C. § 924(e)(1).

### d. Continuous conduct

### i. Parties' arguments

Defendant argues that the convictions in paragraphs 42 and 44 of the PSIR "should be scored, at most, as one predicate offense as they involved continuous conduct" because they were committed in the same five-day period. Defendant's Objections (docket no. 31) at 4; *see also* Defendant's Sentencing Memorandum at 5. Defendant also argues that whether the convictions occurred on different occasions are not "essential elements of the convictions" and, therefore, the court should "not be authorized to make the factual determination as to whether these prior crimes occurred on occasions different from one another or were instead part of a continuous series of conduct." Defendant's Sentencing Memorandum at 6.

The government argues that the convictions described in paragraphs 42 and 44 of the PSIR "should count as three predicate convictions." Government's Sentencing Memorandum at 18. The government argues that, with regard to the burglary convictions in paragraph 42 of the PSIR, although they "occurred on the same day in the same town, the structures were physically separated and constituted different victims." *Id.* at 20. With respect to the attempted burglary conviction outlined in paragraph 44 of the PSIR, the government asserts that it "occurred 50 days earlier, in a different town, in a different

county, involving a different victim." *Id.* Consequently, the government argues that these convictions constitute separate predicate offenses.

### ii.    *Applicable law*

A defendant's prior convictions must be "committed on occasions different from one another" to constitute separate predicate offenses for purposes of 18 U.S.C. § 924(e). In other words, "[t]o qualify as predicate offenses under the statute, each conviction must be a separate and distinct criminal episode, rather than part of a continuous course of conduct." *United States v. Deroo*, 304 F.3d 824, 828 (8th Cir. 2002). A single charging document can be the basis of two different predicate offenses for purposes of 18 U.S.C. § 924(e)(1). *See United States v. Keith*, 638 F.3d 851, 853 (8th Cir. 2011). Courts consider

> at least three factors . . . in deciding whether offenses are sufficiently separate and distinct to serve as individual predicate convictions for ACCA enhancement: (1) the time lapse between offenses, (2) the physical distance between their occurrence, and (3) their lack of overall substantive continuity, a factor that is often demonstrated in the violent-felony context by different victims or different aggressions.

*United States v. Willoughby*, 653 F.3d 738, 742-43 (8th Cir. 2011). "Crimes occurring even minutes apart can qualify . . . [as separate predicate offenses] if they have different victims and are committed in different locations." *Deroo*, 304 F.3d at 828.

### iii.    *Application*

As an initial matter, the court notes that paragraph 42 of the PSIR lists two second degree burglary convictions for which the Defendant was arrested on January 8, 1991, and sentenced on March 25, 1991. The government incorrectly states that both crimes—burglaries of Gerrie's Custom Upholstery and Rausch Brothers—occurred on

February 18, 1991.[11] In fact, the Trial Information indicates that the burglaries of these two establishments, and several others, occurred on December 6, 8 and 9, 1990. The government did not object to paragraph 42 of the PSIR, which so states.

It is not clear from Exhibit 20 on what particular day or days the burglaries of Gerrie's Custom Upholstery and Rausch Brothers occurred, but even if they occurred on the same day, the court finds that the burglaries of these two establishments constitute two separate predicate offenses pursuant to 18 U.S.C. § 924(e). First, the Judgment makes clear that Defendant was convicted of two separate counts of second degree burglary because the court sentenced him to "a term of not to exceed 10 years on each count to run concurrently." Government's Exhibit 20 at 5. Second, although these burglaries occurred in close temporal proximity and in the same town—Ionia, Iowa—they occurred at different establishments, had different victims and were separate acts of aggression, which makes them separate predicate offenses. *See Deroo*, 304 F.3d at 828. Third, and most importantly, the facts of this case are for all intents and purposes nearly indistinguishable from *United States v. Gray*, 85 F.3d 380 (8th Cir. 1996). In *Gray*, the defendant burgled two homes that were in close proximity on the same day in Springfield, Missouri. *Id.* Nine days later, the defendant burgled a third home. *Id.* The defendant "was convicted of three counts of burglary and sentenced to three concurrent terms of five years imprisonment." *Id.* The Eighth Circuit rejected the defendant's argument that "the district court was entitled to consider only one of his burglary convictions because he was not sentenced, punished or rehabilitated, and released before being convicted of the second and third offenses." *Id.* at 381. The Eighth Circuit held that "the ACCA does not require that the predicate felonies be separated by conviction and punishment . . . [and that] [d]iscrete criminal episodes, rather than dates of convictions, trigger the enhancement." *Id.* In

---

[11] This date is not possible given that Defendant was arrested more than a month earlier. It appears that February 18, 1991 is the date on which Defendant pled guilty.

*Gray*, with regard to the defendant's argument that the two burglaries committed on the same day could only count as one predicate offense because they happened twenty-five minutes apart from one another, the Eighth Circuit relied on *United States v. Hamell*, 3 F.3d 1187 (8th Cir. 1993), which held that two assault convictions occurring twenty-five minutes apart were separate predicate offenses under 18 U.S.C. § 924(e)(1). It then held that the principle in "*Hamell* is sufficiently broad to govern the outcome of this case" and noted that *Hamell* itself "cited with approval several decisions from other circuits that had held that multiple burglaries committed on the same day were separate offenses under the ACCA." *Id.* Accordingly, in the instant case, Defendant's two second degree burglary convictions constitute separate predicate offenses under the ACCA.

### 3. Second degree attempted burglary

#### a. Vagueness

##### i. Parties' arguments

Defendant argues that his two convictions for second degree attempted burglary described in paragraph 44 of the PSIR do not qualify as predicate offenses under 18 U.S.C. § 924(e)(1). Specifically, Defendant argues that the language in 18 U.S.C. § 924(e)(2)(B)(ii) that defines a "violent felony" as "otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another"—the residual clause—is unconstitutionally vague. Defendant's Sentencing Memorandum at 9-10.

The government argues that the residual clause is not unconstitutionally vague, citing cases from the Supreme Court, Eighth Circuit and other circuit courts of appeals.

##### ii. Applicable law and application

A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In *Sykes v. United States*, __ U.S. __, 131 S. Ct. 2267 (2011), the Supreme Court held that the residual clause, which defines a violent felony as "otherwise

involv[ing] conduct that presents a serious potential risk of physical injury to another," *see* 18 U.S.C. § 924(e)(2)(B)(ii), is not unconstitutionally vague, but rather, "states an intelligible principle and provides guidance that allows a person to 'conform his or her conduct to the law.'" *Id.* at 2277 (quoting *Chicago v. Morales*, 527 U.S. 41, 58 (1999) (plurality opinion)). Likewise, the Eighth Circuit and each circuit court of appeals that has considered whether the residual clause is unconstitutionally vague has concluded that it is not. *See United States v. Cowan*, 696 F.3d 706, 708 (8th Cir. 2012); *see also United States v. Hart*, 674 F.3d 33, 41 n.3 (1st Cir. 2012)*; United States v. Jones*, 689 F.3d 696, 704 (7th Cir. 2012); *United States v. Sorenson*, 914 F.2d 173, 175 (9th Cir. 1990); *United States v. Turner*, 530 F. App'x 866, 870 (11th Cir. 2013). Accordingly, the court concludes that the residual clause of 18 U.S.C. § 924(e)(2)(B)(ii) is not unconstitutionally vague. However, the court must consider whether the definition of attempted burglary under Iowa law may serve as a predicate offense under 18 U.S.C. § 924(e)(1), under the *Descamps* analysis.

### b. Second degree attempted burglary as a predicate offense

The first step in analyzing whether second degree attempted burglary under Iowa law is a predicate offense under 18 U.S.C. § 924(e)(1) is to determine whether "attempted burglary, as defined by [Iowa] law, is an offense that 'involves conduct that presents a serious potential risk of physical injury to another.'" *James v. United States*, 550 U.S. 192, 201-02 (2007) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)).

In *James*, the Supreme Court construed Florida's attempted burglary statute, which defined burglary as "entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain." *Id.* at 197 (quoting Fla. Stat. § 810.02(1)). "Florida's criminal attempt statute provided: 'A person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of the offense, but fails in the perpetration or is intercepted or prevented in

the execution thereof, commits the offense of criminal attempt.'" *Id.* (quoting Fla. Stat. § 777.04(1)). The Supreme Court noted that while "any act toward the commission of the offense" is broad language, "the Florida Supreme Court has considerably narrowed its application in the context of attempted burglary, requiring an 'overt act directed toward entering or remaining in a structure or conveyance.'" *Id.* at 202 (quoting *Jones v. State*, 608 So. 2d 797, 799 (Fla. 1992)). The Supreme Court held that a conviction under Florida's burglary statute and attempt statute, read in conjunction with the judicial interpretation, is "conduct that presents a serious potential risk of physical injury to another." *Id.* at 206; 18 U.S.C. § 924(e)(2)(B)(ii). The Supreme Court reasoned:

> The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party—whether an occupant, police officer, or a bystander—who comes to investigate. That is, the risk arises not from the completion of the burglary, but from the possibility that an innocent person might appear while the crime is in progress.

> Attempted burglary poses the same kind of risk.

*James*, 550 U.S. at 203. The Supreme Court went on to state that "every Court of Appeals that has construed an attempted burglary law similar to Florida's has held that the offense qualifies as a 'violent felony' under . . . [the] residual [clause]" and that "[t]he only cases holding to the contrary involved attempt laws that could be satisfied by preparatory conduct that does not pose the same risk of violent confrontation and physical harm posed by an attempt to enter a structure illegally." *Id.* at 204-05.

Likewise, the Eighth Circuit has held that violations of Kansas's and Minnesota's attempted burglary statutes are violent felonies for purposes of 18 U.S.C. § 924(e)(2)(B)(ii). *See United States v. Forrest*, 611 F.3d 908, 911-12 (8th Cir. 2010) (holding that attempted burglary qualifies as a violent felony when the Kansas statute defining attempt defines it as "'any overt act toward the perpetration of a crime done by

a person who intends to commit such crime,'" (quoting Kan. Stat. Ann. § 21-3301), when "[t]o prove an overt act under Kansas law, '[i]t must be shown the defendant took a step beyond mere preparation so that some appreciable fragment of the crime was committed,'" (quoting *State v. Chism*, 759 P.2d 105, 110 (Kan. 1998))); *United States v. Smith*, 645 F.3d 998, 1005 (8th Cir. 2011) (holding that attempted burglary qualifies as a violent felony when the Minnesota statute defining attempt states that someone attempts a crime when he "'with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime'" (quoting Minn. Stat. § 609.17(1))).

The definition of attempted burglary under Iowa law is as follows:

> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license, or privilege to do so, attempts to enter an occupied structure, the occupied structure not being open to the public, or who attempts to remain therein after it is closed to the public or after the person's right, license, or privilege to be there has expired, or any person having such intent who attempts to break an occupied structure, commits attempted burglary.

Iowa Code § 713.2. The Iowa Code does not define "attempt." However, pursuant to common law, attempt, prior to Defendant's 1991 second degree attempted burglary conviction, "'require[d] the State to prove (1) intent to commit the crime and (2) slight acts in furtherance of the crime that render voluntary termination improbable.'" *State v. Erving*, 346 N.W.2d 833, 836 (Iowa 1984) (quoting *Fryer v. State*, 325 N.W.2d 400, 406 (Iowa 1982)). The Iowa Supreme Court also defined "the act needed for attempt as one that would 'reach far enough towards the accomplishment, toward the desired result, to amount to the commencement of the consummation, not merely preparatory. It need not [even] be the last proximate act to the consummation of the offense . . . .'" *Erving*, 346 N.W.2d at 836 (alterations in original) (emphasis omitted) (quoting *State v. Roby*, 188 N.W. 709, 714 (Iowa 1922)).

Consistent with *Descamps*, if Iowa's attempted burglary statute is indivisible, then the court must employ a categorical approach, but if the statute is divisible, the court may look to other appropriate documents "to determine which alternative formed the basis of the defendant's prior conviction." *Descamps*, 133 S. Ct. at 2281.

In this case, the "burglary" portion of Iowa's attempted burglary statute is divisible, as discussed above. Based on the Judgment and Sentence, Record of Plea Change and Order, Written Plea of Guilty and the Information in the Iowa District Court for Mitchell County, Criminal No. 3697-0591 (Government Exhibit 21 (docket no. 49-3) at 7, 9, 11 and 46), Defendant pled guilty to one count[12] of attempted burglary that fits the generic definition of burglary, because in the Written Plea of Guilty, Defendant states that he "attempted to break into the Peavey Elevator . . . , which was an occupied structure," that he "did not have permission or the authority to break or attempt to break into said Peavey Elevator" and that he "did so with the specific intent to commit a theft." Government Exhibit 21 at 11.

With respect to the common law definition of "attempt," the court finds the definition set forth by the Iowa Supreme Court is indivisible. To prove an attempt under Iowa law requires "'(1) intent to commit the crime and (2) slight acts in furtherance of the crime that render voluntary termination improbable.'" *Erving*, 346 N.W.2d at 836 (quoting *Fryer*, 325 N.W.2d at 406). In other words, attempt requires an act that would

_____

[12] The Judgment indicates that Defendant pled guilty to two counts of attempted second degree burglary, which would be consistent with the two counts of second degree burglary set forth in the Information. *See* Government's Exhibit 21 at 7, 46. However, the Written Plea of Guilty only sets forth the factual basis for one count of attempted second degree burglary. *See* Government's Exhibit 21 at 9. Moreover, the Record of Plea Change and Order states that Defendant changed his plea to guilty on one count of second degree attempted burglary and, although "two counts" appears to have been written on that document at one point, the phrase has been crossed out. *See* Government's Exhibit 21 at 11. Accordingly, the court concludes that Defendant only pled guilty to one count of second degree attempted burglary.

"'reach far enough towards the accomplishment, toward the desired result, to amount to the commencement of the consummation, not merely preparatory. It need not [even] be the last proximate act to the consummation of the offense . . . .'" *Id.* at 836 (alterations in original) (quoting *Roby*, 188 N.W. at 714). The court finds that the definition of attempted burglary under Iowa law is at least as narrow as the Kansas and Minnesota definitions that the Eighth Circuit has held qualify as violent felonies for the purposes of 18 U.S.C. § 924(e)(2)(b)(ii). Moreover, the court finds that the definition of attempted burglary under Iowa law will ensure that only "conduct that presents a serious potential risk of physical injury to another" will result in a second degree attempted burglary conviction. *See* 18 U.S.C. § 924(e)(2)(B)(ii).[13] Accordingly, the court finds that Defendant's September 24, 1991 second degree attempted burglary conviction in Mitchell County (PSIR ¶ 44) qualifies as a "violent felony" and serves as another predicate offense for purposes of 18 U.S.C. § 924(e)(1).

### 4. *Third degree burglary as a predicate offense*

All burglary offenses, no matter the degree, must meet the following definition under Iowa law:

> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Iowa Code § 713.1. Whether a burglary is first, second or third degree depends on whether the burglar was carrying certain items, inflicted certain injuries on persons and whether persons were present when the burglary occurred. *See id.* § 713.3; *id.* § 713.6.

---

[13] As discussed above, the fact that Defendant's conviction was for second degree attempted burglary, rather than first or third degree attempted burglary, has no bearing on the analysis.

Since all types of burglaries may include, in the alternative, the elements of generic burglary, the only question is whether Defendant's 2003 conviction for third degree burglary in the Iowa District Court for Floyd County, FECR017134, as set forth in paragraph 51 of the PSIR, was done in a manner consistent with the generic definition of burglary. The court employs the modified categorical approach in making this determination. *See Descamps*, 133 S. Ct. at 2281; *accord Olten*, 2014 WL 1924447, at *1.

The Trial Information and the Minutes of Evidence and Testimony, which are attached to the Trial Information, indicate that Defendant gained unlawful entry to both Sherm's Place and the VFW with the intent to steal from the poker machines in each of the establishments. *See* Government Exhibit 23 (docket no. 49-5) at 16-17. As stated in *Johnson*, the court may rely on charging documents to determine whether Defendant pled guilty to the elements of the generic offense. *See Johnson*, 559 U.S. at 144; *cf. State v. Grice*, 515 N.W.2d 20, 23 (Iowa 1994) ("Iowa courts consider both the indictment or information and the minutes filed when determining the adequacy of the allegations to apprise the accused of the crime charged."). In this case, it is clear that Defendant broke into a "building or structure" and, in conjunction with his Written Plea of Guilty (Government Exhibit 23 at 39), in which Defendant stated that he "entered an occupied structure which was not open to the public or remained therein after it was closed to the public or after [his] right, license or privilege to be there had expired" with "the intent to commit a felony," the relevant documents indicate that Defendant was convicted of an offense having the elements of generic burglary. Accordingly, Defendant's March 26, 2003 third degree burglary conviction serves as another predicate offense for purposes of 18 U.S.C. § 924(e)(1).

### 5.    *Conclusion*

Since Defendant's two second degree burglary convictions (PSIR ¶ 42) constitute separate predicate offenses under 18 U.S.C. § 924(e)(1) and Defendant does not object to

the scoring of his 1995 conviction (PSIR ¶ 47) for the delivery of methamphetamine as a predicate offense, the court concludes that the government has proved, by a preponderance of the evidence, that Defendant is an armed career criminal as defined by 18 U.S.C. § 924(e)(1). *See Beatty*, 9 F.3d at 690 ("Under our cases, a district court is clearly permitted to accept as true all factual allegations contained in the PSIR that are not specifically objected to by the parties."); 18 U.S.C. § 924(e)(1); USSG §4B1.4. Defendant also has two other predicate offenses: a second degree attempted burglary conviction (PSIR ¶ 44) and a third degree burglary conviction (PSIR ¶ 51), bringing Defendant to a total of five predicate offenses pursuant to 18 U.S.C. § 924(e)(1).

Defendant's offense level pursuant to USSG §4B1.4(b) is the greatest of the following:

> (1) the offense level applicable from Chapters Two and Three; or

> (2) the offense level from §4B1.1 (Career Offender) if applicable, or

> (3) (A) 34, if the defendant used or possessed the firearm or ammunition in connection with either a crime of violence, as defined in §4B1.2(a), or a controlled substance offense, as defined by §4B1.2(b), or if the firearm possessed by the defendant was of a type described in 26 U.S.C. § 5845(a)*; or

> (B) 33, otherwise.*

> * If an adjustment from §3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

USSG §4B1.4(b). Although Defendant satisfies the criteria of USSG §4B1.4(b)(3)(A), this provision would give Defendant an offense level of 34. Since the offense level applicable from Chapters Two and Three is 43, Defendant is an armed career criminal with an

offense level of 43 and Criminal History Category VI. *See* USSG § 4B1.4(c)(1)-(2). Since Defendant meets the criteria of 18 U.S.C. § 924(e)(1), his mandatory minimum sentence is fifteen years imprisonment and he may be sentenced to life in prison.

## X. PRE-DEPARTURE ADVISORY SENTENCING GUIDELINES RANGE

Defendant has an offense level of 43 and is Criminal History Category VI, which makes his Guidelines range life in prison.

## XI. DEPARTURES

"[T]he district court . . . should determine first the appropriate guideline range, then decide if the guidelines permit a traditional departure, and finally determine whether the [18 U.S.C.] § 3553(a) factors justify a variance from this 'guidelines sentence.'" *United States v. Miller*, 479 F.3d 984, 986 (8th Cir. 2007) (citing *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir. 2005)).

In discussing the propriety of Chapter 5 departures generally, the Eighth Circuit has stated:

> Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG §5K2.0. The guidelines provide that sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted. USSG §1A1.1, [comment. (n.4(b))].

*United States v. Chase*, 451 F.3d 474, 482 (8th Cir. 2006) (formatting altered).

The decision whether to depart from the advisory Sentencing Guidelines range rests within the sound discretion of the district court. *See, e.g.*, *United States v. Thin Elk*, 321

F.3d 704, 707 (8th Cir. 2003) (reviewing for an abuse of discretion "because the decision to depart embodies the traditional exercise of discretion by the sentencing court" (citation omitted) (internal quotation marks omitted)). However, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases." *Koon v. United States*, 518 U.S. 81, 98 (1996). The district court must "carefully articulate the reasons for departure, particularly where the waters are uncharted." *United States v. Reinke*, 283 F.3d 918, 925-26 (8th Cir. 2002).

"The district court is not left adrift . . . in determining which cases fall within and which cases fall outside of the 'heartland.'" *United States v. McCart*, 377 F.3d 874, 877 (8th Cir. 2004) (citing *Koon*, 518 U.S. at 94). In USSG §5K2.1 through USSG §5K2.24, "[t]he Sentencing Commission enumerated some of the factors that it believed were not adequately accounted for in the formulation of the Guidelines and might merit consideration as aggravating or mitigating circumstances." *Thin Elk*, 321 F.3d at 708 (citing USSG §5K2.0).

### A. Departure Under USSG §4A1.3(a)

#### 1. Parties' arguments

The government argues that the court should depart upward pursuant to USSG §4A1.3(a) "because Defendant's criminal history score substantially underrepresents the seriousness of his criminal history and likelihood of reoffending." Government's Sentencing Memorandum at 38. Specifically, the government argues that "[D]efendant's criminal history shows that he is a serial violator and recidivist." *Id.* at 39. The government notes that "[D]efendant has been convicted of twelve offenses from the time he was eighteen to thirty-four years old" and that "Defendant has also committed numerous offenses while other charges were pending or while on parole or release." *Id.* The government contends that "Defendant's criminal history . . . shows him to be violent" and that his criminal history score does not reflect "[D]efendant's capacity for future violence." *Id.* at 40. Furthermore, the government argues that "nine of [D]efendant's

twelve convictions did not score any criminal history points." *Id.* at 41. And, finally, the government contends that Defendant only needs three predicate offenses to be considered an armed career criminal, but he has five predicate offenses. *See id.* Accordingly, the government argues that "an upward departure . . . is appropriate because [D]efendant's history of criminal convictions . . . shows that even Criminal History Category VI substantially under-represents the seriousness of . . . [D]efendant's criminal history and the likelihood that . . . [D]efendant will commit other crimes." *Id.*

At the sentencing hearing, Defendant argued that the Guidelines have been approved by Congress and that the court should defer to Congress's judgment.

### 2.    *Applicable law*

Pursuant to USSG §4A1.3(a), "[i]f reliable information indicates that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." USSG §4A1.3(a). When a court determines it should depart from Criminal History Category VI, "the court should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." *Id.* §4A1.3(a)(4)(B).

### 3.    *Application*

Because the court finds that the first degree murder cross reference applies, USSG §2A1.1, Defendant is Criminal History Category VI and has an offense level of 43, which means his Guidelines range is life in prison. In those circumstances, Defendant's criminal history category and offense level would both be at their maximum and there would be no reason to depart upward. However, if the Eighth Circuit determines that the court erred in calculating Defendant's pre-departure Guidelines range and that Defendant's offense level is less than 43, the court concludes that a three level upward departure is warranted pursuant to USSG §4A1.3 for the following reasons.

58

First, Defendant is not a typical Criminal History Category VI defendant. While Defendant has only nine criminal history points scored, which would make him a Criminal History Category IV, he has multiple unscored offenses. For example, in paragraph 42 of the PSIR, Defendant was convicted of two separate burglaries, neither of which scored any criminal history points. *See* PSIR ¶ 42. In paragraph 43 of the PSIR, Defendant was convicted of theft, but this did not score any criminal history points either. *See id.* ¶ 43. In paragraph 44 of the PSIR, Defendant was not scored with any criminal history points for his conviction of attempted burglary. *See id.* ¶ 44. In paragraph 46 of the PSIR, Defendant was convicted of transportation, domination and control of firearms by a felon, which was unscored, and then he violated the rules of his probation by violating the law and failing to pay his financial obligations. *See id.* ¶ 46. The Eighth Circuit has held that "[t]he Sentencing Guidelines expressly permit a court to consider . . . un-scored offense[s]." *United States v. Outlaw*, 720 F.3d 990, 993 (8th Cir. 2013). And the Eighth Circuit has held that an upward departure is warranted pursuant to USSG §4A1.3(a) based, in part, on un-scored convictions. *See United States v. Wilson*, 369 F. App'x 753, 754 (8th Cir. 2010) (per curiam).

Moreover, although Defendant is Criminal History Category VI due to his status as an armed career criminal who possessed a firearm of the type described by 26 U.S.C. § 5845(a), *see* USSG §4B1.4(c)(2), he actually has five predicate offenses. This also warrants an upward departure. *See United States v. McDougald*, 390 F. App'x 299, 300 (8th Cir. 2010) (per curiam).

Second, Defendant's prior criminal history warrants an upward departure because he has many "[p]rior sentence[s] of substantially more than one year imposed as a result of independent crimes committed on different occasions." USSG §4A1.3(a)(2)(B); *see also United States v. Yahnke*, 297 F. Supp. 2d 1173, 1190 (N.D. Iowa 2003) (departing, in part, based on the defendant having been sentenced to more than one year on prior crimes), *aff'd*, 395 F.3d 823 (8th Cir. 2005). Defendant was sentenced to ten years in

prison for each of his two second degree burglary convictions (PSIR ¶ 42); to two years for his theft conviction (PSIR ¶ 43); to five years for his second degree attempted burglary conviction (PSIR ¶ 44); to five years for transporting, dominating and controlling firearms as a felon (PSIR ¶ 46); to ten years for delivering methamphetamine (PSIR ¶ 47); and to five years for third degree burglary (PSIR ¶ 51).

Third, the Guidelines do not adequately account for the substantial likelihood that Defendant will recidivate if released from his term of imprisonment. Defendant is a convicted serial burglar. The evidence indicates that he has committed many other uncharged burglaries as well, including burglaries of the homes of Gerald Slessor and Mr. Gallmeyer, and the burglary of Gilbert's Sale Yard. This also warrants an upward departure. *See, e.g.*, *United States v. Mendez*, 685 F.3d 769, 771-72 (8th Cir. 2012) (affirming the district court's upward departure based, in part, on the fact that the defendant was a serial, incorrigible recidivist); *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) (affirming the district court's upward departure based, in part, on defendant being a serial violator); *see also United States v. Walking Eagle*, 553 F.3d 654, 657 (8th Cir. 2009) ("In deciding the likelihood that a defendant may commit other crimes, a court may 'take into account any evidence of obvious incorrigibility' and 'conclude that . . . leniency has not been effective.'" (alteration in original) (quoting *United States v. Herr*, 202 F.3d 1014, 1016 (8th Cir. 2000) (internal quotation marks omitted))).

For all of these reasons, the court concludes that a three level upward departure is warranted if the Eighth Circuit concludes that the court erred in its calculation of Defendant's offense level or criminal history category. Defendant is an unrepentant recidivist who has committed multiple crimes of violence and who arms himself in violation of federal and state laws prohibiting felons from possessing firearms and ammunition. Prior lenient treatment by state courts has not brought about any changes in his behavior and, in fact, Defendant's criminal behavior is escalating. Pursuant to USSG

§4A1.3(a)(4)(B), if the Eighth Circuit finds that the court erred in calculating Defendant's pre-departure Guidelines range, the court finds that it is appropriate to depart upward three levels to offense level 43, because, given Defendant's criminal history, only a life sentence is appropriate. *See* USSG §4A1.3(a)(4)(B).

## B. Departures Under USSG *§5K2.0 and USSG §5K2.1*

The government also argues that the court should depart upward pursuant to USSG §5K2.0 because the Guidelines fail to account for: (1) Defendant's possession of two destructive devices; (2) the seriousness of Defendant's conduct; and (3) Defendant's repeated use and possession of firearms in connection with multiple other felonies. *See* Government's Sentencing Memorandum at 33-36. The government also argues that the court should depart upward pursuant to USSG §5K2.1, because death resulted from Defendant possessing a sawed-off shotgun.

First, given that the court has applied the cross reference to homicide, the court finds that the government's departure argument pursuant to USSG §5K2.1, which states that, "if death resulted," a "court may increase the sentence above the authorized guideline range," no longer applies. *See* USSG §5K2.1. Defendant's Guidelines range has already taken into account the death of Mr. Gallmeyer.

Second, with respect to the government's argument that the court should depart upward pursuant to USSG §5K2.0, the court finds that an upward departure is not necessary given that, in the event the Eighth Circuit finds that the court erred in its Guidelines calculation, the court has already departed upward to the maximum sentence pursuant to USSG §4A1.3(a).

Accordingly, the government's requests for upward departure based on USSG §5K2.0 and USSG §5K2.1 are denied. The court reserves the right to reconsider these arguments in the event this case is overturned on appeal and remanded for sentencing.

## XII. DISPOSITION

The court finds that Defendant is Criminal History Category VI with an offense level of 43 based on Defendant's classification as a career offender, an armed career criminal and because he committed the first degree murder of Mr. Gallmeyer. In the event the Eighth Circuit finds that Defendant only committed second degree murder, Defendant is Criminal History Category VI with an offense level of 43 based on Defendant's status as a career offender and armed career criminal, his commission of second degree murder, his obstruction of justice, which results in two additional levels, and because Defendant's criminal history and likelihood to reoffend are underrepresented by the Guidelines, which results in an additional three levels pursuant to USSG §4A1.3. Accordingly, in any event, Defendant's final advisory Guidelines range is life imprisonment. The court reserves ruling on the government's and Defendant's requests for variances. The court will hear arguments from the parties regarding the appropriate sentence on **June 19, 2014 at 2:00 p.m.** in Courtroom 1.

**IT IS SO ORDERED.**

**DATED** this 12th day of June, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA